UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALBINA HEAD START, INC., : | |
| : | |
| Plaintiff, : | Civil Action No.:   24-2423 (RC) |
| : | |
| v. : | Re Document Nos.:   7, 8, 13 |
| : | |
| U.S. DEPARTMENT OF HEALTH : | |
| AND HUMAN SERVICES, *et al.*, : | |
| : | |
| Defendants. : | |

MEMORANDUM OPINION

GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S

MOTION FOR SUMMARY JUDGMENT

I.  INTRODUCTION

Plaintiff Albina Head Start, Inc. is a Head Start agency that receives federal funding to provide early education services to approximately 1,150 children and expectant families in Portland, Oregon.  In 2024, the Department of Health and Human Services ("HHS") determined that Albina had two deficiencies in its Head Start programs arising from teachers lacking necessary credentials and an incident in which a teaching assistant threw a wooden block at a child.  Under HHS regulations, these two deficiencies during the relevant five-year funding period subjected Albina to an open competition for its next five years of funding rather than automatic renewal.

After receiving notice of this open competition, Albina sued HHS under the Administrative Procedure Act ("APA"), contending that HHS's decision was arbitrary, capricious, and not in accordance with law because it violated the Improving Head Start for School Readiness Act of 2007 and the agency's regulations regarding grantees' personnel

policies. Specifically, Albina contends that the Act's definition of "deficiency" does not allow HHS to attribute the isolated actions of a rogue employee to the Head Start agency. Albina also argues that it cannot be found deficient because it followed HHS regulations requiring Head Start agencies to penalize staff who violate standards of conduct, and Albina immediately dismissed the teaching assistant and reported the incident to appropriate authorities. Following cross-motions for summary judgment, the Court concludes that Albina has not established that HHS violated the Act or its own regulations by finding a deficiency based on an incident in which a teaching assistant engaged in physical abuse of a child. The Court thus grants summary judgment to HHS and denies Albina's cross-motion for summary judgment.

## II.  BACKGROUND

### A.  Statutory and Regulatory Background

"Established in 1965, the Head Start program awards grants to local agencies—public, non-profit, and for-profit—to provide 'comprehensive child development services,' with an emphasis on enabling preschool children to develop skills necessary to succeed in school." *Ohio Head Start Ass'n, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 873 F. Supp. 2d 335, 339–40 (D.D.C. 2012), *aff'd*, 510 F. App'x 1 (D.C. Cir. 2013). "Congress expanded the program in 1995 to include services for pregnant women and children under the age of three ('Early Head Start')." *Id.* (citing Head Start Act Amendments of 1994, 42 U.S.C. § 9840a (2007)). Head Start agencies are generally designated "for a period of 5 years." 42 U.S.C. § 9883.

Before 2007, Head Start agencies were generally not required to compete for renewed funding after HHS awarded them a federal grant. *See Ohio Head Start Ass'n*, 873 F. Supp. 2d at 341. In 2005, the Government Accountability Office released a report indicating that many Head Start agencies demonstrated poor performance, and that HHS rarely used its authority to replace

2

poorly performing grantees by funding new grantees. *See* U.S. Gov't Accountability Off., GAO-05-176, Head Start: Comprehensive Approach to Identifying and Addressing Risks Could Help Prevent Grantee Financial Management Weaknesses 27–31 (2005) ("GAO Report"). The Office of Head Start ("the Office") "continue[d] to fund a grantee—even a deficient grantee—until the grantee either relinquishe[d] the grant or the grantee [was] terminated." *Id.* at 27. The GAO Report observed that "[b]oth termination and negotiations toward relinquishment" of the grant could "be protracted." *Id.* at 28. The report concluded that "[c]ompetition for grants might create a stronger incentive for those grantees that are not performing up to standards to correct their problems." *Id.* at 31.

Congress responded by introducing a "Designation Renewal System" in the Head Start for School Readiness Act of 2007, instructing the Secretary of Health and Human Services to develop a system to determine whether a Head Start grantee was "successfully delivering a high-quality and comprehensive Head Start program." Head Start for School Readiness Act of 2007, Pub. L. No. 110-134 § 7, 121 Stat. 1363, 1379–80 (2007) (codified at 42 U.S.C. § 9836(c)(6)(A)). The Secretary was required to convene an expert panel to "provide[] recommendations on the proposed system for designation renewal that takes into account" various criteria. *Id.* (codified at 42 U.S.C. § 9836(c)(4)). The Secretary has since promulgated regulations establishing seven conditions under which a Head Start agency will be required to compete for its next five years of funding, including when the Head Start agency "has two or more deficiencies." 45 C.F.R. § 1304.11(a). A Head Start agency found "to be delivering a high-quality and comprehensive Head Start program shall be designated . . . as a Head Start agency for the period of 5 years described in [42 U.S.C. § 9833]." Head Start for School Readiness Act, § 7 (codified at 42 U.S.C. § 9836(c)(7)(A)(i)). In contrast, a Head Start agency

3

found "to not be delivering a high-quality and comprehensive Head Start program shall be subject to an open competition." *Id.* (codified at 42 U.S.C. § 9836(c)(7)(A)(ii)); *see also* 42 U.S.C. § 9836(d) (establishing considerations for designation of a Head Start agency through competition).

Although not legally binding, the accompanying legislative report from the then-titled House Committee on Education and Labor provides some context for these changes. *See* H.R. Rep. No. 110-67 (2007). The Committee expressed its belief that "most Head Start programs run high-quality early education programs with sound fiscal management," but that the Act "takes a number of steps to improve Head Start accountability." *Id.* at 60. Citing the GAO Report, the Committee found that "limited recompetition of low-performing Head Start agencies will improve overall program performance." *Id.* The Committee, however, did not see value in recompetition of "high-quality grantees," commenting that the new "provisions are not intended to give the Secretary discretion to re-compete the majority of Head Start programs as the Committee strongly believes this would undermine overall program quality." *Id.* at 61.

The Head Start for School Readiness Act of 2007 additionally defined the term "deficiency." *See* § 3(a)(5) (codified at 42 U.S.C. § 9832(2)); *see also Camden Cnty. Council on Econ. Opportunity v. U.S. Dep't of Health & Hum. Servs.*, 586 F.3d 992, 994 (D.C. Cir. 2009) (observing that the Head Start Act previously "did not define the term 'deficiency'"); 42 U.S.C. § 9836a(e) (providing framework for correction of deficiencies). A deficiency occurs when a Head Start agency suffers "a systemic or substantial material failure . . . in an area of performance that the Secretary determines involves" any of six specific factors, such as "a threat to the health, safety, or civil rights of children or staff" or "the misuse of funds received under this subchapter." 42 U.S.C. § 9832(2). When a grantee fails to correct deficiencies, HHS may

initiate proceedings to terminate the agency's designation as a Head Start agency. *See id.* § 9836a(e)(1)(C).

HHS has additionally implemented program performance standards that grantees are required to meet to operate a Head Start program. *See* 45 C.F.R. § 1302.1; *see also* 42 U.S.C. § 9836a(a)(1)(E) (empowering the Secretary to promulgate regulations establishing performance standards for Head Start agencies and programs). Among other requirements, those standards dictate that a Head Start program must establish written personnel policies and procedures, including standards of conduct. *See* 45 C.F.R. § 1302.90(a), (c). At the time of the relevant events in this lawsuit, the regulation stated that "[a] program must ensure all staff, consultants, contractors, and volunteers abide by the program's standards of conduct" that "[e]nsure staff, consultants, contractors, and volunteers do not maltreat or endanger the health or safety of children, including, at a minimum, that staff must not . . . [p]hysically abuse a child." *Id.* § 1302.90(c) (effective from Nov. 7, 2016, to Aug. 20, 2024).[1]

### B. Factual Background

The facts of this case are not disputed. Albina is a Head Start agency that receives federal funding to provide early education services to approximately 1,150 children and expectant families in Portland, Oregon. AR 003128. The organization has been in operation for approximately 60 years. *Id.*

In January 2023, following a regular monitoring review, HHS's Office of Head Start informed Albina that it believed some of the Head Start agency's staff members lacked the necessary qualifications to provide direct services to children and families participating in Early

---

[1] HHS has since revised the relevant language in the regulation. *See* Supporting the Head Start Workforce and Consistent Quality Programming, 89 Fed. Reg. 67720, 67813 (Aug. 21, 2024).

5

Head Start programs.  AR 003130; *see also* 42 U.S.C. § 9840a(h) (requiring such staff to "have a minimum of a child development associate credential, and have been trained (or have equivalent coursework) in early childhood development").  The Office provided Albina 120 days to correct the issue.  *See* AR 003130.  After a follow up review, the Office determined in July 2023 that Albina had not corrected the area of noncompliance and concluded that the Head Start agency had "at least one area of deficiency in its Head Start and Early Head Start programs."  AR 003136.  Albina contested this finding, arguing that the deficiency was unwarranted because it was based on a limited number of staff with expired education waivers, because the effects of the COVID-19 pandemic continued to challenge staff, and because Albina prioritized hiring and training staff within the local community while they pursued the necessary education.  *See* AR 003141–43.  The Office declined to revisit its deficiency finding.  *See* AR 003148, 003152.  Albina does not dispute the validity of this first deficiency in this lawsuit.

In November 2023, a teacher assistant at an Albina facility "threw a block at a 5-year-old child" during scheduled naptime, "causing injury," before "repeating 'Shut up' and 'Go to sleep' while walking away from the child."  AR 003009.  Albina staff reviewed the classroom tape, immediately terminated the teacher assistant, and reported the incident to Oregon state authorities on the same day.  *Id.*  Albina reported the incident to the Office of Head Start on the following day.  *Id.*; *see also* 45 C.F.R. § 1302.102(d)(1)(ii) (requiring Head Start programs to immediately report health and safety incidents to HHS officials).  The Office found a deficiency because "[t]he grant recipient did not ensure all staff refrained from using unacceptable discipline methods with children; therefore, it was not in compliance with the regulation" regarding standards of conduct.  AR 003009.  In response to the incident, Albina introduced a five-week new hire orientation, added additional in-service training days, enhanced training

monitoring, revised the timing of staff breaks, and increased monitoring of new hires to identify potential issues.  *See* AR 003012–16; AR 003017–20.  A follow-up monitoring review indicated that Albina had corrected the deficiency.  AR 003017–20.

On February 29, 2024, the Office of Head Start notified Albina that it was required to compete for its next five years of funding because it was determined to have two or more deficiencies over the five-year project period.  *See* AR 003153 (citing the deficiency for staff qualifications and the deficiency for personnel policies related to the incident of physical abuse).  The notice stated that Albina would "continue to receive grant funding until such competition has concluded."  AR 003154.

Albina filed this lawsuit on August 21, 2024, challenging the second deficiency finding that triggered the competition letter.  *See generally* Compl., ECF No. 1.  Albina contended (1) that HHS's definition of "deficiency" contravenes the text of the Head Start for School Readiness Act of 2007; (2) that HHS's deficiency determination contradicts its personnel policy regulations found in 45 C.F.R. § 1302.90(c); and (3) that HHS's rules implementing the designation renewal system stand at odds with the statutory language.  *Id.* ¶¶ 88–102.  The parties cross-moved for summary judgment, *see* Pl.'s Mot. Summ. J., ECF No. 7; Defs.' Cross-Mot. Summ. J. and Opp'n to Pl.s' Mot. Summ. J., ECF No. 8, and those motions are ripe for review.

### III.  LEGAL STANDARD

In a typical case, a court may grant summary judgment to a movant who "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But when assessing administrative action, at the summary judgment stage "the district judge sits as an appellate tribunal," *Am. Bioscience, Inc. v.*

*Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), limited to determining whether, as a matter of law, the evidence in the administrative record supports the agency's decision, *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013). "In the APA context, summary judgment is the mechanism for deciding whether, as a matter of law, an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 93 (D.D.C. 2020).

Under Section 706(2)(A) of the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Moreover, a change in policy or decision is arbitrary and capricious if the agency fails to "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

When considering questions of law, however, courts must "apply[] their own judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). The APA "specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action— even those involving ambiguous laws—and set aside any such action inconsistent with the law as

8

they interpret it." *Id.* (emphasis omitted) (citation omitted).  The APA thus "prescribes no deferential standard for courts to employ in answering those legal questions." *Id.*

### IV.  ANALYSIS

Albina levies two main legal attacks on HHS's actions.  Albina first argues that the Office of Head Start's deficiency determination was contrary to law because the Head Start for School Readiness Act of 2007 defines a "deficiency" as a failure of a Head Start *agency*, and that a rogue employee does not act on the agency's behalf.  *See* Mem. in Supp. of Pl.'s Mot. Summ. J. ("Pl.'s Mot.") at 15–19, ECF No. 7-1.  Albina next asserts that the deficiency determination was contrary to the language of 45 C.F.R. § 1302.90(c), arguing that the regulation delegates to the Head Start agency the duty of enforcing standards of conduct, and Albina terminated the relevant employee here.  *See* Pl.'s Mot. at 19–21.  The Court considers each of these arguments and concludes that neither is persuasive.

As an initial matter, HHS contends that Albina fails to challenge final agency action.  The APA provides a cause of action solely to challenge final agency action, *see Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018), as the APA only provides for judicial review of "final agency action for which there is no other adequate remedy," 5 U.S.C. § 704.  Final agency action "must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).  The action must also "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

HHS argues that the competition letter is not the "consummation" of HHS's decision-making process regarding grant funding, and immediate "legal consequences" do not flow from Albina's obligation to compete. Mem. in Supp. of Defs.' Cross-Mot. Summ. J. at 16–20 ("Defs.' Mot."), ECF No. 8-1. Albina responds that HHS's deficiency determination was final and triggered its requirement to compete, and that the deficiency determination begets legal consequences because Albina is no longer entitled to automatic renewal of funding. Pl.'s Opp'n to Defs.' Cross-Mot. Summ. J. and Reply in Supp. of Mot. Summ. J. ("Pl.'s Opp'n") at 3–12, ECF No. 11. HHS has expressly declined to establish a mechanism for grantees to appeal competition letters, *see* Head Start Designation Renewal System 85 Fed. Reg. 53189, 53193 (Aug. 28, 2020), meaning that the decision that Albina has a second deficiency and must compete likely represents the "consummation" of the agency's decision-making process in that regard. Yet it is less clear whether Albina has already suffered legal consequences, as its funding purportedly persists until the competition is concluded, AR 003154, and it has not yet been denied further funding.[2] The Court need not resolve this issue, however, because Albina's challenge ultimately fails on other grounds, and the existence of final agency action is not jurisdictional in nature. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183 (D.C. Cir. 2006).

In addition, HHS points out that it moved for summary judgment on Count Three of the Complaint challenging the agency's designation renewal rule, *see* Defs.' Mot. at 13–16, and that Albina conceded that issue by declining to respond to it, *see* Defs.' Reply at 1, ECF No. 12; *see*

---

[2] Had Albina received the competition letter after August 21, 2024, it likely would have suffered immediate legal consequences because it would be ineligible for a waiver of certain requirements regarding staff wages. *See* 45 C.F.R. § 1302.90(e)(8)(ii)(B) (prohibiting the Secretary from granting a wage waiver if the Head Start program has "been designated to compete under the Designation Renewal System after August 21, 2024").

10

*also* Pl.'s Opp'n.  The Court agrees and thus grants HHS summary judgment on Count Three of the Complaint.  The Court notes, however, that the legal challenge within Count Three is quite similar to that within Count One, as both counts challenge HHS's interpretation of the word "deficiency" to include a single incident involving a staff member acting contrary to the requirements of his employment.  *Compare* Compl. ¶¶ 88–91, *with* Compl. ¶¶ 99–102.[3]  Accordingly, dismissal of Count Three has minimal impact on the ultimate outcome of the case on the merits.

### A. Definition of Deficiency as "Failure of an Agency"

Albina argues that HHS's interpretation of the word "deficiency" contravenes the Head Start for School Readiness Act of 2007 by faulting the Head Start agency for the actions of a single employee acting against his training and the wishes of his employer.  *See* Pl.'s Mot. at 15–19.  Albina asserts that Congress intended to import the common law into the statute, such that "a 'deficiency' must be the result of acts or omissions for which the local Head Start grantee could be held responsible at common law."  *Id.* at 16.  This amounts to an unlawful "strict liability standard" in Albina's view.  *Id.* at 19.  HHS responds that it did not impose vicarious

---

[3] Albina also seeks leave to file a surreply.  Pl.'s Mot. Leave File Surreply, ECF No. 13.  HHS opposes the motion.  Defs.' Mem. Opp'n Pl.'s Mot. Leave File Surreply, ECF No. 16.  The decision to grant or deny leave to file a surreply "is entrusted to the sound discretion of the district court."  *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 187 (D.D.C. 2012) (citing *Akers v. Beal Bank,* 760 F. Supp. 2d 1, 2 (D.D.C. 2011)).  "A court determining whether to allow a surreply considers whether the reply raises new arguments, whether the proposed surreply would be helpful to the resolution of the pending motion, and whether the other party would be unduly prejudiced."  *Jackson v. Starbucks Corp.*, No. 19-cv-1487, 2022 WL 888180, at *3 n.2 (D.D.C. Mar. 25, 2022) (citing *Glass v. Lahood*, 786 F. Supp. 2d 189, 230–31 (D.D.C. 2011)).  Here, HHS's reply brief does not raise new arguments, and the proposed surreply is generally not helpful—it largely rephrases points already made in Albina's previous briefing.  But, because HHS will not be prejudiced were leave to file granted, the Court grants Albina leave to file its proposed surreply.

liability on Albina, but rather found that Albina violated regulatory provisions requiring it to ensure that staff members do not engage in physically abusive behavior.  *See* Defs.' Mot. at 24–25 (citing 45 C.F.R. § 1302.90(c)(1)(ii)(G)).  The Court concludes that Albina has not established that HHS erroneously applied the statutory definition of "deficiency" here.

Recall that Congress defined "deficiency" to mean "a systemic or substantial material failure of an agency in an area of performance that the Secretary determines involves" certain categories of issues, including "a threat to the health, safety, or civil rights of children or staff." 42 U.S.C. § 9832(2)(A).  To prevail, Albina would need to demonstrate that an incident in which an Albina employee struck a child during scheduled naptime before telling the child to "Shut up" and "Go to sleep," AR 003009, does not represent a "substantial material failure of [the] agency" involving "a threat to the health [or] safety . . . of children or staff," 42 U.S.C. § 9832(2)(A). This is a tall order.  For one thing, Congress understood that a single incident could trigger a deficiency finding, as "the statutory definition of a 'deficiency,' . . . includes either 'systemic' *or* 'substantial' material failures."  *Ohio Head Start Ass'n*, 873 F. Supp. 2d at 354; *see also* Pl.'s Mot. at 1, 7 (emphasizing that the abuse represented an "isolated incident").  Although the statute does not further define "substantial," the word "suggests 'considerable' or 'specified to a large degree.'"  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999); *see also* Substantial, Sense I.4.a., Oxford English Dictionary (2024) ("of real significance, weighty").  The Court simply cannot agree that HHS erred by finding this incident of physical abuse to be a considerable or weighty material failure related to the health and safety of a child.

Albina argues that a deficiency only exists when the systemic or substantial material failure is of "an agency," and that "the Head Start Act means that a 'deficiency' must be the result of acts or omissions for which the local Head Start grantee could be held responsible at

common law." Pl.'s Mot. at 16. Congress generally expects that statutes will import common-law principles unless the statute indicates otherwise, Albina asserts, and agency law principles present no exception. *See id.* (citing *United States v. Texas*, 507 U.S. 529, 534 (1993); *United States v. Wells*, 519 U.S. 482, 491 (1997)). "At common law," Albina continues, "an employer is not liable for the actions of its employees if the employee's conduct is contrary to the employer's purpose as expressed through its policies, training, supervision, and disciplinary measures." *Id.* Albina concludes that because the teacher assistant acted contrary to the employer's purpose, it would not be "liable" for his conduct at common law. *See Id.*[4]

The problem, however, is that 42 U.S.C. § 9832(2) is a statutory definition to be consulted throughout a particular subchapter of Title 42, and not a tort or damages cause of action with a common law analogue. As HHS argues, "[t]he issue of whether the Head Start Act allows the Office to impose either strict or vicarious liability is irrelevant because the Office imposed neither kind of liability on Plaintiff." Defs.' Reply at 8. The statute does not render anyone "liable" or include any other term of art that might require resort to the common law.

---

[4] Albina's preferred scope of common law vicarious liability is too narrow, as several courts applying District of Columbia law have found that employers could be liable for far more egregious conduct than that at issue here. *See, e.g.*, *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (holding that a reasonable jury could conclude that laundromat employee's shooting of a complaining customer "arose out of and was related to" the shooter's "employment"); *Doe v. Sipper*, 821 F. Supp. 2d 384, 388 (D.D.C. 2011) (explaining that "[t]he District of Columbia . . . does not subscribe to the blanket proposition that sexual assaults never come within the scope of employment"); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001) (holding similarly). The key question is not the severity of the defendant-employee's actions, but rather whether the injury "grew out of a job-related controversy," *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 234 (D.D.C. 2015) (quoting *Hechinger Co. v. Johnson*, 761 A.2d 15, 25 (D.C. 2000), or was motivated, "at least in part, by a desire to serve" the employer's interest. *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001). Here, it would be reasonable to conclude that the teacher assistant's treatment of the child was motivated, at least in part, by a desire to serve the employer's interest in effectively controlling students.

*See United States v. Honeywell Int'l Inc.*, 47 F.4th 805, 814 (D.C. Cir. 2022) ("presum[ing] statutory *torts* share fundamental attributes of common law *torts* when they incorporate traditional *tort* terms of art" (emphasis added)).  Albina's cases limiting the scope of damages or tort liability are thus inapposite here.  Albina cites, for instance, *Nelson v. United States*, 838 F.2d 1280, 1283 (D.C. Cir. 1988), a case about the Federal Tort Claims Act.  *See* Pl.'s Mot. at 16.  Albina also appeals to several restatements, which discuss tort liability.  *See id.*  In addition, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), interpreted Title VII's damages provision and relied on Congress's "express" direction for "federal courts to interpret Title VII based on agency principles."  *Id.* at 754; *see also* Pl.'s Mot. at 16–17.  These cases do not support Albina's position that the statutory definition here must be interpreted in terms of common law vicarious and strict liability.

      Albina's reading would also all but nullify the statute.  It is not often that an employee becomes "a threat to the health, safety, or civil rights of children or staff" to further a Head Start agency's interest or purpose, particularly given that doing so may trigger a competition letter.  42 U.S.C. § 9832(2)(A)(i).  Nor does an employee usually misappropriate an employer's federal grant funding, render the agency financially unviable, or lose its permits in the interest of the employer.  42 U.S.C. § 9832(2)(A)(iv), (v) (defining other deficiencies).  At least under Albina's construction of agency law, these actions would seldom be attributable to the Head Start agency, and HHS would be unable to find deficiencies simply because an employee did not act in accordance with the Head Start agency's policies.  So too would HHS be most constrained from finding grantees deficient in the most egregious cases, a paradoxical outcome.

      Albina's reading of the statute, which would require any harms to arise from a Head Start agency's agent, also excludes numerous failures the statutory provision was likely intended to

14

include. If the Head Start agency does not commit a substantial material failure when a rogue employee represents "a threat to the health, safety, or civil rights of children or staff," 42 U.S.C. § 9832(2)(A)(i), then it stands to reason that a Head Start agency could not accrue a deficiency by failing to protect children from non-employees or environmental hazards, as these dangers would not be agents of the grantee. That certainly cannot be true. The text and structure of the statute indicate that Congress likely intended Head Start agencies to be responsible for deficiencies in the listed areas of performance regardless of the cause.

Here, HHS found a deficiency flowing directly from Albina's actions or omissions, namely the failure to ensure that employees do not "[p]hysically abuse a child." 45 C.F.R. § 1302.90(c)(1)(ii). Albina does not challenge HHS's authority to promulgate that personnel regulation, and it does not argue that the incident was not a substantial material failure in an area of performance involving a threat to a child. Because Albina does not establish that it was not responsible for the failure, the Court concludes that HHS properly found a deficiency following the incident involving physical abuse of a child. As such, HHS is entitled to summary judgment on Count One of the Complaint, and Albina's motion for summary judgment is denied in that respect.

### B. Deficiency Determination as Contrary to 45 C.F.R. § 1302.90(c)

Albina next argues that the deficiency determination was contrary to HHS's own regulations setting out required personnel policies and procedures, and that Albina had those policies and enforced them here. *See* Pl.'s Mot. at 19–21. HHS argues that "[t]he regulation's plain language did not merely require Plaintiff to have standards of conduct in place, but rather, imposed on Plaintiff the duty to actually 'ensure all staff, consultants, contractors, and volunteers abide by the program's standards of conduct.'" Defs.' Mot. at 27 (quoting 45 C.F.R.

§ 1302.90(c)(1)).  The Court agrees with HHS that the regulation's plain meaning requires a Head Start program to actually prevent staff from engaging in corporal punishment or physically abusive behavior.

"[C]ourts exercise independent review over the meaning of agency rules."  *Kisor v. Wilkie*, 588 U.S. 558, 581 (2019).  "[A] court must apply all traditional methods of interpretation to any rule, and must enforce the plain meaning those methods uncover."  *Id.*  "Courts defer to an agency's interpretation of its own regulation if the regulation in question is 'genuinely ambiguous' and if the agency's reading is reasonable."  *Doe v. Sec. & Exch. Comm'n*, 28 F.4th 1306, 1311 (D.C. Cir. 2022) (quoting *Kisor*, 588 U.S. at 575).  "The interpretation must be the agency's 'authoritative' or 'official position,' 'implicate its substantive expertise' and reflect 'fair and considered judgment' to receive deference."  *Id.* (quoting *Kisor*, 588 U.S. at 576–80).

Under the plain meaning of the relevant regulation at the time of the events at issue, Albina failed to establish standards of conduct that ensured staff did not maltreat or endanger the health or safety of children.  The regulation required a Head Start program to "[e]nsure" that this conduct does not occur, not merely deter it.  45 C.F.R. § 1302.90(c)(1) (effective from Nov. 7, 2016, to Aug. 20, 2024).  It provided that the standards of conduct must "[e]nsure staff . . . do not maltreat or endanger the health or safety of children."  *Id.* § 1302.90(c)(1)(ii).  It also dictated that "staff must not . . . [u]se corporal punishment" or "[p]hysically abuse a child."  *Id.*  A plain reading of the regulation's text reveals that it is not satisfied merely by the creation of standards of conduct, but rather by their effective implementation in a manner that prevents mistreatment of children.  By failing to ensure that physical abuse of a child did not occur, Albina fell out of compliance with the regulation.

Albina asserts that this reading of the rule contradicts HHS's own explanation of the regulation. *See* Pl.'s Mot. at 20 (citing Head Start Performance Standards, 81 Fed Reg. 61294, 61351 (Sept. 6, 2016)). That explanation stated that "the local Head Start grantee would be responsible for enforcement of its own Standards of Conduct," according to Albina. *Id.* The relevant discussion in the Federal Register indicates that HHS "expect[ed] programs to designate staff that will determine appropriate penalties" and that "local programs are best suited to determine who that staff should be." Head Start Performance Standards, 81 Fed Reg. 61294, 61351 (Sept. 6, 2016); *see also* Pl.'s Opp'n at 13–14 (quoting the relevant text). No part of that explanation supports Albina's position that a Head Start program can comply with 45 C.F.R. § 1302.90(c)(1) when it fails to actually prevent staff members from physically abusing a child.

Albina additionally argues that HHS's reading of the regulation renders another portion superfluous. *See* Pl.'s Mot. at 20–21 (citing 45 C.F.R. § 1302.90(c)(2)). That provision—which remains unchanged since the relevant events—dictates that "[p]ersonnel policies and procedures must include appropriate penalties for staff, consultants, and volunteers who violate the standards of conduct." 45 C.F.R. § 1302.90(c)(2). Albina states that this provision "vest[s] authority to enforce the standards of conduct contained within 45 C.F.R. § 1302.90(c)(1) with the local Head Start grantee, and not HHS." Pl.'s Opp'n at 13. Because HHS issued the deficiency determination, "HHS took this responsibility away from Albina." *Id.* at 14. Yet a plain reading of the regulation shows that a Head Start program must comply with *both* the (c)(1) and (c)(2) provisions—the program must "ensure" that staff do not engage in prohibited behavior *and* enact appropriate penalties for individuals who violate standards of conduct. *See* Defs.' Mot. at 28. Albina's reading of the regulation would wholly exempt a program from ensuring the health and safety of children so long as its "policies and procedures . . . include appropriate penalties for

17

staff." 45 C.F.R. § 1302.90(c)(2).  There is no basis, however, to read the regulation in that manner.  There is also no basis to believe that HHS intended to withdraw its own ability to identify a deficiency when a Head Start agency fails to effectively protect a child's health and safety.  Doing so would likely contravene HHS's statutory obligations to identify and correct deficiencies, *see* 42 U.S.C. § 9836a(e), which include "threat[s] to the health, safety, or civil rights of children or staff," 42 U.S.C. § 9832(2)(A)(i).  For these reasons, the Court grants HHS summary judgment on Count Two of the Complaint and denies Albina's motion for summary judgment as to that count.

## V.  CONCLUSION

For the foregoing reasons, HHS's Motion for Summary Judgment is **GRANTED**, and Albina's Motion for Summary Judgment is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 5, 2025                                                                RUDOLPH CONTRERAS
                                                                                                        United States District Judge